**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

DENNIS G. JONES, II,                    )      CASE NO. 4:10-cv-01467
                                        )
    Plaintiff,                          )
                                        )      MAGISTRATE JUDGE
        v.                           )      NANCY A. VECCHIARELLI
                                        )
COMMISSIONER OF SOCIAL SECURITY,        )
                                        )      MEMORANDUM OF OPINION
    Defendant.                          )      AND ORDER
                                        )

       This case is before the magistrate judge by consent.  Plaintiff, Dennis G. Jones,

II ("Jones"), challenges the final decision of the Commissioner of Social Security

("Commissioner") denying Jones's application for a period of Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and for

Supplemental Security Incom ("SSI") under Title XVI of the Social Security Act ("Act"),

42 U.S.C. §§ 423 and 1381(a).  This court has jurisdiction pursuant to 42 U.S.C. §

405(g).  For the reasons given below, the court **REVERSES** the opinion of the

Commissioner and **REMANDS** the case for the ALJ to make findings regarding the

extent, if any, to which Jones's tracheal tube and oxygen tank limit Jones's functional

abilities, including without limitation, the use of his hands.  Further, such limitation shall

be included in a hypothetical question to a vocational expert.

I.  Procedural History

Jones filed an application for DIB and SSI on September 24, 2007, alleging disability as of July 4, 2007.  His application was denied initially and upon reconsideration.  Jones timely requested an administrative hearing.

Administrative Law Judge John Kooser ("ALJ") held a hearing on June 1, 2009. Jones, represented by counsel, testified on his own behalf at the hearing.  Dr. William Reed testified as a vocational expert ("VE").  The ALJ issued a decision on September 10, 2009, in which he determined that Jones is not disabled.  Jones requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on May 12, 2010, the ALJ's decision became the final decision of the Commissioner.

Jones filed an appeal to this court on July 1, 2010.  Jones alleges that the ALJ erred because (1) the ALJ failed to give adequate reasons for rejecting the opinion of Jones's treating physician; (2) the ALJ did not validly articulate reasons for rejecting the results of Jones's vocational evaluation; (3) the ALJ's Residual Functional Capacity ("RFC") assessment is ambiguous and unsupported by substantial evidence; and (4) the ALJ failed to develop the record fully by ordering a consultative examination.  The Commissioner denies that the ALJ erred.

II.  Evidence

A.    *Personal and Vocational Evidence*

Jones was born on October 27, 1958 and was 50 years old on the date of the ALJ's decision.  He has a high school education and past relevant work as a forklift operator.

2

B.    *Medical Evidence*

Jim McGaha, M.Ed., administered a series of psychological tests to Jones on October 3, 2006.  Tr. at 205-09.  McGaha found that Jones suffered from a major depressive disorder, an unspecified personality disorder, heart problems, sleep apnea, high blood pressure, and a variety of psychosocial stressors.  He assigned Jones a Global Assessment of Functioning ("GAF") of 55.[1]  McGaha added that Jones's depression is accompanied by feelings of anxiety and guilt.  McGaha reported Jones as feeling unhappy all the time and crying without good reason.  McGaha also said that Jones described himself as very lonely and had some suicidal ideation.  McGaha recommended counseling, medication, weight reduction, drug screening, and help with acquiring a driver's license to solve Jones's transportation problems.

On September 7, 2006, Jones was hospitalized at St. Elizabeth Hospital for high blood pressure after complaining of shortness of breath, intermittent dizziness, intermittent swelling of both legs, and blurred vision.  Tr. at 196-200, 203-04.  The admitting physician noted a long history of hypertension, sleep apnea, and alcohol abuse.  Jones reported that shortness of breath had lasted for two months and that he could walk only one block before becoming short of breath.  His blood pressure was 240/120.  In addition to high blood pressure, the treating physician noted congestive heart failure, alcoholic hepatitis with possible cirrhosis, renal insufficiency, sleep apnea, and obesity, with a possible myocardial infarction.  Jones was treated with oxygen, clondine, Norvasc, Cardizem, Lasix, K-Dur, heparin, Flonase, Atrovent, and an albuterol

---

[1]  A GAF of 51-60 indicates serious symptoms or any serious impariment in social occupational, or school functioning.

3

inhaler.  The hospital discharged Jones on September 14, 2007.  During a follow-up visit on September 22, 2007, Jones reported continued leg swelling, shortness of breath, and dizziness.

Jones was again hospitalized on April 12, 2007 after suffering dizziness.  Tr. at 362-65.  The admitting physician diagnosed Jones as suffering from accelerated hypertension, chronic kidney disease, obstructive sleep apnea, and obesity.  His legs swelled during his hospitalization, causing his physicians to discontinue Cardizem.  Jones reported that he had a history of not taking his medications because he could not afford them.  The hospital restarted his medications and discharged him on April 18, 2007 with a regimen of clonidine, fluticasone, hydralazine, hydrochlorothiazide, lisinopril, labetalol, albuterol, hydralazine, K-Dur, and Lasix.  His diagnosis upon discharge was accelerated hypertension, chronic kidney disease, obstructive sleep apnea, and obesity.

On July 30, 2007, Jones received an x-ray after complaining of shortness of breath.  Tr. at 450.  The results showed a mild cardiac enlargement with pulmonary vascular congestion and prominent interstitial markings.  The impression was mild congestive heart failure.

On August 28, 2007, Jones reported to the St. Elizabeth Health Center complaining of shortness of breath, coughing, nocturnal dyspnea, and leg swelling.  Tr. at 224-27, 350-53.  Jones stated that he had missed taking some of his medications for a month, but he did not know which ones.  The emergency room physician diagnosed congestive heart failure and hypoxia and admitted him to intensive care.  An echocardiogram revealed a mildly dilated right ventrical with a paradoxical septal motion and an ejection fraction of 55%.  Jones underwent a tracheostomy on September 2,

4

2007.  A Doppler study revealed severe concentric left ventricular hypertrophy.  Tr. at

461.  Jones was prescribed hydrocodone, Bacitracin zinc, K-Dur, hydralazine,

carvedilol, metaxalone, Senokot, diltiazem/hydrochoride, Diltiazen, spironolactone,

torsemide, Mucomyst, Catapres, clindamycin, isorbide mononitrate, ferrous sulfate,

Colace, and a multivitamin.  Jones was hospitalized until September 20, 2007, when he

was discharged with a diagnosis of pulmonary heart disease, chronic renal failure,

obstructive sleep apnea, hypertension, and congestive heart failure.

On September 5, 2007, Dr. Victor Lossev, completed a Physician Certification of

Medication Dependency for the Bureau of Disability Determination ("Bureau").  Tr. at

220-22.  Dr. Losser listed congestive heart failure, morbid obesity, obstructive sleep

apnea, post tracheostomy, chronic renal insufficiency, a propensity to hypercardial

respiration, chronic kidney disease, anemia, and substance abuse as Jones's chronic

medical condicitons.  Dr. Lossev also noted a long-term history of hypertension.  The

doctor listed Jones's current medications as Coreg, Cardizem, Lasix, cipresoline, K-Dur,

and clonidine.  He opined that Jones's condition was good or stable with treatment.  He

also opined that Jones was "morbidly obese with limited to severely impaired functional

capacity.  Significant chronic edema on [sic] lower extr. with propensity for development

of pulmonary edema secondary to significant congestive heart failure."  Tr. at 221

(abbreviations in the original).  According to Dr. Lossev, Jones was unable to walk,

stand, or sit for any amount of time in an eight-hour workday; could lift up to five pounds

occasionally or frequently; was extremely limited in his ability to push, pull, bend, or

reach; and was markedly limited in his ability to handle or engage in repetitive foot

movements.  When asked for the observations or medical evidence which led to these

5

findings, Dr. Lossev said that morbid obesity, easy fatigue, and a propensity to hypercardic respiratory insufficiency were causing the limitations.  Dr. Lossev further opined that Jones was unemployable and that his physical limitations were expected to last for 12 months or more.

On October 12, 2007, Jones's blood pressure had decreased to 139/63, and he was denied shortness of breath, orthopnea, or exertional dyspnea.  Tr. 249.

On December 5, 2007, Dimitri Teague, M.D., completed a Physical Functional Capacity Assessment of Jones at the request of the Bureau.  Tr. 274-82.  Dr. Teague opined that Jones was limited to lifting 20 pounds occasionally and 10 pounds frequently and could stand/walk and sit about six hours in an eight-hour workday.  When asked to cite the specific facts upon which his opinion was based, Dr. Teague wrote as follows:

> Clmt is 49 y/o male alleging disability to to chronic renal, CHF, sleep apnea, tracheostomy.  Clmts renal function is at baseline, he has chronic kidney disease stage III/focal segmental glomerulsclerosis.  He has HTN, anemia and hyperlipidemia.  He is obese.  Cardia exam shows RRR w/o murmurs, rubs, or gallops.  Extremities reveal 1-2+ edema.  Respiratory has scattered rhonchi.
>
> ECHO 9/07 showed RV mildly dilated, LVEF 55%.
>
> 9/25/07 OV:  BP 149/66, resp rate 16, HR 81.  ROS - No chest pain, dyspnea, orthopnea/PND.  PE:  alert in no acute distress.  Heart sounds are nml with no MGRs. . . .
>
> Labs show BUN 16, Cr- 1.7 Hct 30.7 K+ 4.8.
>
> 10/15/07 IM OV:  BP 139/63 resp 22.  Currently no SOB[,] PND, or orthopnea, exertional dyspnea, decr leg swelling.  Lungs are clear to auscultation bilaterally, heat sounds are nml with no MGRs.  Non-pitting edema bilaterally.  Assessment CHF secopndary to hypertensive CM, compensated.  HTN controlled.  Wt down from 360 to 311.5.

Tr. at 275 (capitalization altered from the original; abbreviations in the original).  Dr.

6

Teague also opined that Jones had no manipulative, visual, or communicative limitations but should avoid hazards such as heavy machinery.  Dr. Teague also indicated that the file did not contain an opinion from a treating physician.

Treatment notes from October 18, 2007 through January 9, 2008 reported that Jones was doing well and coughing less.  Tr. at 321-25, 346.  They also record that Jones had trouble with swelling and discharge at the site of the tracheostomy.  When the tracheostomy tube was changed regularly and properly, these problems were eliminated.  Jones continued to lose weight.  On February 22, 2008, treatment notes show that Jones's hypertension was not well controlled, and isosorbidel was prescribed.

On February 2, 2009, treatment notes indicate that Jones had gained five pounds, his hypertension was still not well-controlled, his heart disease was stable, he was experiencing itching in the abdomen and groin, and he was suffering from edema and morning headaches.  Tr. at 366.  He did not complain of shortness of breath, cough, other pain, dizziness, or blurred vision.  Jones was admonished to diet and exercise to lose weight, and his dosage of clonidine was increased.

Over the next four months, Jones variously complained of shortness of breath, a lack of energy, and mild fatigue.  Tr. at 475-80.  His blood pressure was mildly elevated, and he displayed some edema.  He continued his follow-ups for congestive heart failure, chronic kidney disease, sleep apnea, status post tracheotomy, and hypertension.

On December 18, 2008, Robert Mangiarelli, M.Ed., a vocational expert, tested Jones and completed an assessment of his employability at the request of the Bureau. Tr. at 341-42.  Jones was friendly, cooperative, and appropriately groomed and attired.

7

During the evaluation, Jones had coughing spells and displayed difficulty breathing.  He reported difficulty breathing because of the tracheostomy and told Mangiarelli that he required oxygen at home.  Mangiarelli observed, "In order for Mr. Jones to talk, he needs to place his finger over the trach site which cuts off his breathing during the time." Tr. at 341.  Mangiarelli determined that Jones was not a candidate for training involving computers or alphanumerical detail and that he had no transferable job skills. Mangiarelli concluded as follows:

> In the opinion of this vocational specialist, Mr. Jones is displaying insufficient worker traits to qualify for gainful employment.  Observations made of physical capacities during the evaluation coupled with information provided by Mr. Jones would indicate this individual will not be able to sustain himself in work activities including those of a sedentary nature . . . When considering all information presented, it is the opinion of this vocational specialist that Mr. Jones would not be capable of engaging in any and all forms of sustained, remunerative employment at this time.

Tr. at 342.

On January 16, 2008, Jones visited John J. Brescia, a psychologist, for a clinical interview and mental status examination.  Tr. at 283-93.  Jones used oxygen during the interview and was casually attired and adequately groomed.  He was polite and cooperative.  Jones was lucid and coherent, and his responses and affect were appropriate.  Jones reported that he had stopped using drugs, alcohol, and cigarettes as of 2005 or 2006.  He stated that he had been depressed for a long time but that his depression had worsened since his tracheostomy.  Jones denied current suicidal ideation and did not exhibit any manifestations of anxiety.  Brescia found no indication of delusional thinking or formal thought disorder.  Jones was oriented as to time, place, person, and situation and exhibited average cognitive functioning.  Jones told Brescia

8

that he spent most of his time studying "God's word," drawing, watching movies, or working out "when I have the breath to do it." Tr. at 290. Jones prepared his own food, washed dishes, and did laundry but did not otherwise do chores around the house. He went to the St. Elizabeth Hospital "cardio gym" a couple times a week to work out.[2] He primarily socialized at church.

Brescia concluded that Jones exhibited moderate to serious symptoms of depression, sometimes felt like crying, and had a pessimistic and discouraged outlook. Brescia diagnosed Jones as suffering from an unspecified depressive disorder and polysubstance dependence in full remission. He indicated that Jones's general medical conditions included congestive heart failure, sleep apnea, and high blood pressure. Brescia assigned Jones a current GAF of 55. Brescia based his estimate of Jones's functional impairments primarily on Jones's medical problems. Brescia opined, however, that Jones's depression mildly to moderately impairs his ability to relate to others; moderately impairs his ability to understand, remember, and follow instructions; moderately impairs his ability to maintain attention and perform routine tasks; and moderately impairs his ability to withstand the stress and pressures associated with everyday work activity.

On February 11, 2008, Karen Terry, Ph.D., completed a Psychiatric Review Technique assessing Jones's mental condition. Tr. at 294-309. Dr. Terry found that Jones suffered from an unspecified depressive disorder and polysubstance dependence in sustained full remission. She opined that Jones had mild restrictions in his activities

---

[2] The exercise was part of a prescribed regimen to build Jones's endurance.

of daily living and ability to maintain social functioning and moderate difficulties in maintaining concentration, persistence, and pace.  Dr. Terry also opined that Jones was moderately limited in his abilities to understand and remember detailed instructions, carry out detailed instructions, maintain concentration and attention over extended periods, complete a normal workday and workweek without interruption from psychologically-based symptoms and perform at a reasonable pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting.  Dr. Terry found that Jones's statements of functional limitations were supported as to their nature but not as to their severity.  She concluded, "Clmt retains the ability to perform simple to moderately complex tasks that are brief in nature and in a low stress, routine and static environment with no more than superficial interactions and no production goals/quotas or the need to perform rapidly."  Tr. at 310 (abbreviation in the original).

Clinical notes show that on February 2, 2009, Jones complained of an itchy underbelly.  Tr. 366.  He was diagnosed with hypertension, not well controlled, stable COPD, sleep apnea, obesity, and skin itch.

Jones visited Turning Point Counseling Services on November 23, 2009 for diagnostic assessment and on December 15, 2009 for therapy.  Tr. at 487-510.  Jones reported that he sought therapy to treat his depressive symptoms.  At the initial assessment, Jones was assigned a GAF of 50.[3]

C.     *Hearing Testimony*

---

[3]  A GAF of 41 to 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.

On June 1, 2009, Jones testified at his administrative hearing that he occasionally provided child care for his grandsons.  Tr. at 17.  He stated that his sleep apnea had improved and that although he used a portable oxygen tank, he did not use it all the time.  Tr. at 20-21.[4]  Jones asserted that the extent of his use depended in part upon the weather but that he nevertheless used it every day.  Tr. at 21.  In particular, Jones stated, "[I]f I'm out during the day like I have to pretty much put -- have it on all the time especially like when the weather's hot.  It's -- in the wintertime it's not so bad."  Tr. at 21.  Jones also told the court that he had to cover his tracheal tube to project his voice when he talked.  Tr. at 19.  He said that he had a weight problem and stated that his doctor had recommended gastric bypass surgery.  Tr. at 22.  According to Jones, when he mowed his front lawn, he had to stop two or three times due to shortness of breath, and he became out of breath with even minimal effort.  Tr. at 22.  He also testified that he walked for exercise and could walk around the block but that he had difficulty and had to stop when walking his dog because the dog liked to pull at the leash.  Jones stated that he had participated in a rehabilitative exercise regimen at the hospital consisting of lifting weights, bicycling, and treadmills, but he had to stop because he could not afford it.  Tr. at 23.   Jones denied problems with sitting but said that he had difficulty standing and working for two hours at the church dinner at the end of every month, a task that required minimal lifting.  Tr. at 24-25.  He also testified that he has chest pains and headaches upon overexertion but that he had not suffered such symptoms recently because he had avoided overexertion.  Tr. at 28-29.  Jones stated

---

[4]  Jones used his portable oxygen tank during the hearing.

11

that he did his own cooking, cleaning, laundry, and shopping.  Tr. at 31.  He did not go on trips or go fishing despite a desire to do so, but he said that he was able to "do things" with his grandson.  Jones denied smoking since 2007, denied using alcohol as of 2008, and denied using illegal drugs.  When the ALJ asked Jones if he could do a job that required lifting 15 to 20 pounds once in a while, with a sit-stand option, and allowed working at his own pace, Jones opined that he probably could and that he'd "give it a try."  Tr. at 34-35.  Jones also opined that he could probably stand four hours in an eight-hour day but not for six hours.  He also testified that he would be willing to try walking for six hours in an eight-hour day but that he didn't believe he could do it.  Tr. at 35-36.

The ALJ asked the VE to assume an individual with Jones's vocational factors limited to a capacity to perform light work.  He also asked the VE to assume the following limitations:  The individual would need to be able to alternate between sitting and standing every hour; would be limited to no more than occasional climbing, stooping, kneeling, crouching, and crawling; would not be able to work with exposure to occupational hazards, such as heights, flames, and machinery; and would not be able to work in temperature extremes, near airborne environmental irritants, smoke, fumes, or excessive levels of humidity.  Tr. at 38.  The ALJ then asked the VE if such an individual could perform Jones's past work, and the VE said that he could not.  When asked if there was any other work in the national economy that such an individual could perform, the VE said there were.  These included such jobs as unskilled security guard, photocopy and other business machine operator, and assembler.

III.  Standard for Disability

12

A claimant is entitled to receive benefits under the Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second,  the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent his from doing his past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent his from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

13

IV.  Summary of Commissioner's Decision

In determining that Jones was not disabled, the ALJ made the following relevant findings:

3.   The claimant has the following severe impairments:  depression, tracheostomy, hypertension, congestive heart failure, and sleep apnea. Furthermore, according to his testimony  the claimant stands 5'10" in height and weighs 347 pounds.  Accordingly, the claimant is obese.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with a sit\stand option at least every hour; the claimant is limited to no more than occasional postural activities; the claimant should have no exposure to unprotected heights, dangerous moving machinery, or other workplace hazards; claimant should have no exposure to extremes of temperature, dust, fumes, gases, or other pulmonary irritants.  He is limited to unskilled work involving simple, routine, repetitive tasks.

6.   The claimant is unable to perform any past relevant work.

7.   The claimant was born on October 27, 1958 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged onset date. The claimant subsequently changed age category to closely approaching advanced age.

8.   The claimant has at least a high school education and is able to communicate in English.

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability, as defined in the Social

Security Act, from July 4, 2007, through the date of this decision.

Tr. at 52-57 (citations omitted).

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI. Analysis

Jones alleges that the ALJ erred because (1) the ALJ failed to give adequate reasons for rejecting the opinion of Jones's treating physician; (2) the ALJ did not validly articulate reasons for rejecting the results of Jones's vocational evaluation; (3) the ALJ's RFC assessment is ambiguous and unsupported by substantial evidence; and (4) the ALJ failed to develop the record fully by ordering a consultative examination. The Commissioner denies that the ALJ erred.

*A.      Whether the ALJ erred in failing to give adequate reasons for rejecting the*

15

*opinion of Jones's treating physician*

Jones argues that the ALJ erred in failing to give adequate reasons for rejecting the opinion of Jones's treating physician, Dr. Lossev.  The Commissioner asserts that there is no evidence in the record that Dr. Lossev was Jones's treating physician.

A "treating source" is an "acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1502.  The opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  The ALJ must provide "good reasons" for the weight assigned to treating physicians.  Failure to do so does not constitute harmless error and requires remand. *Wilson v. Commissioner of Social Security*, 378, F.3d, 541, 544 (6th. Cir. 2004).

Dr. Lossev found that Jones was unable to walk, stand, or sit for any amount of time in an eight-hour workday; could lift up to five pounds occasionally or frequently; was extremely limited in his ability to push, pull, bend, or reach; and was markedly limited in his ability to handle or engage in repetitive foot movements.  Dr. Lossev further opined that Jones was unemployable and that his physical limitations were expected to last for 12 months or more.

16

Jones contends that Dr. Lossev's opinion should be regarded as the opinion of a treating physician.  Dr. Lossev expressed the above opinions in a Certification of Medication Dependency.  That form contains a Statement of Certification to be completed by the treating physician. Dr. Lossev did not complete that portion of the Statement of Certification which reads as follows:

> A medication-dependent person is one who is undergoing treatment for a chronic medical condition which requires the continuous prescription of the medication listed above for a long-term-indefinite time.  The loss of access to the listed medications would result in a significant risk of a medical emergency and loss of employability for at least 9 months.
>
> _____ is my patient and my signature below certifies that based on this definition of medication dependency:
>
> ☐    (s)he is a medication dependent person.
> ☐    (s)he is a NOT medication dependent person.

Dr. Lossev signed the Certification of Medication Dependency without completing the above Statement of Certification.  In addition, there is nothing the Certification of Medication Dependency indicating the basis for Dr. Lossev's opinions other than a notation that Dr. Lossev examined Jones on September 5, 2007.

Between August 28, 2007 and September 20, 2007, the period during which Dr. Lossev completed his Certification of Medication Dependency, Jones was hospitalized with a diagnosis of congestive heart failure and hypoxia and underwent a tracheostomy. Jones's treating physician on the medical records associated with this visit was Dr. Charles Wilkins, with Dr. Julius A. Kato listed as a consulting physician.  Jones does not point to any document associated with this hospital stay, or any other document in the record, which would indicate that Dr. Lossev provided him treatment or that Jones had an ongoing relationship with Dr. Lossev.

17

In sum, there is no evidence in the record that Dr. Lossev was Jones's treating physician.  Absent such evidence, the ALJ did not err in failing to treat Dr. Lossev's opinions as the opinions of a treating physician, either in the degree of deference accorded them or in declining to provide the detailed statement of "good reasons" required when the opinion of a treating physician is not given controlling weight.

In dismissing Dr. Lossev's opinion that Jones was unemployable, the ALJ wrote, "Because Dr. Lossev's opinion was issued during the height of the claimant's hypertensive crisis and represents only a 'snapshot' of the claimant['s] condition, I find that Dr. Lossev's opinion represents an overestimate of the claimant's limitations."  Tr. at 56.  The ALJ also stated that he gave great weight to the opinion of the State agency medical and psychological consultants because they were "consistent with other substantial evidence of record."  *Id.*  These reasons are sufficient to justify the ALJ's treatment of Dr. Lossev's opinion.  Jones's contention that the ALJ erred in failing to give adequate reasons for rejecting the opinion of Dr. Lossev, therefore, is not well-taken.

B.    *Whether the ALJ failed validly to articulate reasons for rejecting the results of Jones's vocational evaluation*

Jones also contends that the ALJ erred in failing to articulate reasons for rejecting the results of Mangiarelli's vocational evaluation of Jones.  Jones argues that although the Mangiarelli was not a "acceptable" medical source, he was nevertheless a medical source who had an opportunity to observe Jones's behavior and tested Jones extensively.  Thus, Jones claims, Mangiarelli's opinion regarding Jones's vocational prospects was due greater deference than was according it by the ALJ.  The

18

Commissioner denies that Mangiarelli was a medical source and denies that Mangiarelli's opinion should have been given greater deference as such a source.

Title 20 C.F.R. § 404.1513(a) ("§ 404.1513(a)") lists licensed physicians, licensed or certified psychologists,[5] licensed podiatrists, and qualified speech-language pathologists as "acceptable medical sources." Section 404.1513(d) describes "other sources." Section 404.1513(d)(1) includes medical sources not listed in § 404.1513(a), including, by way of example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists.

Title 20 C.F.R. § 404.1527 and Social Security Ruling 06-03p, 2006 WL 2329939 (S.S.A. August 9, 2006) ("SSR 06-03p"), discuss how the Commissioner should evaluate opinion evidence. SSR 06-03p provides, "Opinions from . . . medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p at *3. With regard to non-medical sources who have had contact with the individual in their professional capacity, their opinions, too, should be considered by the Commissioner in assessing claims. *Id.*

The opinions of "other sources" can be evaluated using the same factors used in evaluating the opinions of acceptable medical sources. *Id.* at *4-*5. This does not mean, however, that the Commissioner is required to discuss each of these factors in

_____

[5] Included with licensed or certified psychologists are "school psychologists, or other licensed or certified individuals with other titles who perform the same functions as a school psychologist in a school setting, for purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning only." C.F.R. § 404.1513(a)(2).

19

his evaluation of "other sources" in his opinion:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* at *6.  Generally, then, an ALJ's assessment of an "other source" is adequate if it allows a claimant or subsequent reviewer to follow the ALJ's reasoning.

After interviewing Jones and administering a variety of psychological tests, Mangiarelli stated,

> Observations made of physical capacities during the evaluation coupled with information provided by Mr. Jones would indicate this individual will not be able to sustain himself in work activities including those of a sedentary nature . . . When considering all information presented, it is the opinion of this vocational specialist that Mr. Jones would not be capable of engaging in any and all forms of sustained, remunerative employment at this time.

Tr. at 342.  In dismissing Mangiarelli's opinion, the ALJ wrote, "Ultimately, I give this assessment little weight because it does not rely upon or make reference to any medical findings or physical testing."  Tr. at 56.  The ALJ noted that the opinion of the state agency physician was consistent with the record.

Jones errs in assuming that Mangiarelli was a medical source with respect to Jones's *physical* capacities.  Mangiarelli was a certified vocational expert with a master's degree in education.  He interviewed Jones and administered a series of psychological tests.  There is no indication in the record that Mangiarelli had any

20

expertise with respect to assessing an individual's physical ailments or that he had access to any data regarding Jones's physical ailments unavailable to the ALJ. Consequently, Mangiarelli's opinion is not entitled to any deference as an "other" medical opinion.

In addition, the ALJ's written opinion satisfies the requirement of SSR 06-03p that the opinion "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning . . . ." Quite simply, the ALJ pointed out that there was no relevant basis for Mangiarelli's opinions regarding Jones's physical capacities. Because the ALJ made clear that Mangiarelli's opinion was without a relevant foundation and that it differed from an acceptable medical opinion that was consistent with the record, the ALJ fulfilled his obligation to allow the claimant or a subsequent reviewer to follow his reasoning. For these reasons, Jones's contention that the ALJ failed validly to articulate reasons for rejecting the results of Jones's vocational evaluation is without merit.

C.  *Whether the ALJ's RFC assessment is ambiguous and unsupported by substantial evidence*

Jones contends that the ALJ's assessment of Jones's RFC is ambiguous and unsupported by substantial evidence. In particular, Jones argues that the ALJ failed to take into consideration when assessing Jones's RFC that Jones must carry an oxygen tank and use a hand to close his tracheal tube to talk. Jones also contends that the ALJ's opinion is not supported by substantial evidence because the Commissioner improperly gave greater weight to the opinion of a non-examining source, the agency physician, than to the opinions of a treating and an examining source, Dr. Lossev and

Mangiarelli.  The Commissioner responds that the ALJ considered Jones's portable

supplemental oxygen tank and that the opinions of Dr. Lossev and Mangiarelli were not

entitled to greater weight than the opinion of the state agency physician.

The ALJ found that Jones was capable of unskilled light work with certain

additional limitations.  None of those additional limitations involved limitations on

Jones's capacity to use his hands to manipulate objects.  Social Security Rule 83-10,

1983 WL 31251 (S.S.A. 1983) ("SSR 83-10"), described light work as follows:

> 2. *Light work*.  The regulations define light work as lifting no more than 20 pounds
> at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . .
> Many unskilled light jobs are performed primarily in one location, with the ability
> to stand being more critical than the ability to walk.  *They require use of arms and
> hands to grasp and to hold and turn objects*, and they generally do not require
> use of the fingers for fine activities to the extent required in much sedentary work.

(Emphasis added.)  The use of arms and hands, then, is generally required by unskilled

light work.

Evidence in the record indicates that Jones has to use a finger to close his

tracheal tube to talk and that Jones uses his portable oxygen tank during the day,

particularly on hot days, when he had trouble breathing.  There is an absence of

evidence in the record regarding how Jones carries his oxygen tank when he uses it

and the extent to which carrying the tank interferes with the use of his hands.  The ALJ

did not discuss in his opinion the limitations that Jones's tracheal tube and oxygen tank

imposed on Jones's use of his hands, nor did he include any such limitations in the

hypothetical question to the ALJ.  For this reason, the case must be remanded to the

ALJ for him to make findings regarding the extent, if any, to which Jones's tracheal tube

and oxygen tank limit Jones's use of his hands and to include any such limits in a

hypothetical question to a vocational expert.

Jones's argument that the ALJ's opinion is not supported by substantial evidence because the Commissioner improperly gave greater weight to the opinion of a non-examining source, the agency physician, than to the opinions of a treating and an examining source, Dr. Lossev and Mangiarelli, is based on mistaken assumptions.  As already discussed, there is no evidence that Dr. Lossev is Jones's treating physician, and Mangiarelli is not an "examining source" for purposes of Jones's *physical* ailments and limitations.  The ALJ said that he gave greater weight to the opinion of the agency physician, Dr. Teague, because Dr. Teague's opinion was more consistent with the record as a whole, because Dr. Lossev's opinion was rendered at a time when Jones's physical condition was at its nadir, and because Mangiarelli's opinion did not rely upon or make reference to any medical findings or physical testing.  These are sufficient reasons to justify the greater weight given Dr. Teague's opinion.  Jones's contention that in this respect the ALJ's opinion is not supported by substantial evidence is not well-taken.

D.    *Whether the ALJ failed to develop the record fully by ordering a consultative examination*

Jones contends that the ALJ erred by failing to order a consultative examination concerning his physical condition.  The Commissioner responds that the ALJ was not required to order a consultative examination.

Title 20 CFR §§ 404.1512 (f), 416.912 provide that "[i]f the information we need is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or

more consultative examinations at our expense."  The decision to order a consultative examination is within the discretion of the Commissioner.  *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *see also Landsaw v. Sec'y of Health & Human Servs.*,  803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."). Nevertheless, the failure to exercise that discretion when the record is inadequate to assess the claimant's RFC is grounds for reversal.  *Porzondek v. Commissioner*, 1993 WL 15135 (6th Cir. Jan. 22, 1993).

Jones contends that because the ALJ discredited the information from Dr. Lossev and Mangiarelli, then the ALJ was required to order a consultative medical examination as part of his duty to fully develop the record.  As has already been discussed, this incorrectly assumes that Dr. Lossev and Mangiarelli were medical treatment sources.

The record contains a great deal of information from medical treatment sources, including treatment records from Jones's hospital stays, clinical notes, and the results of various tests to assess Jones's physical condition.  In assessing Jones's RFC, the ALJ relied primarily on the Residual Functional Capacity Assessment of Jones which Dr. Teague completed on December 5, 2007.  That assessment was based in part on the information from medical treatment sources described above.  There is no indication that Dr. Teague found the information in the record to be inadequate in assessing Jones's physical capabilities.  In addition, the ALJ relied on Jones's own testimony during the hearing that he could probably perform a job that allowed him to sit and stand

24

throughout the day.  The medical and other information in the record constitutes

substantial evidence in support of the ALJ's assessment of Jones's RFC.  The ALJ did

not, therefore, abuse his discretion in declining to order a consultative examination of

Jones.

VII.  Decision

For the reasons set forth above, the court REVERSES the opinion of the

Commissioner and REMANDS the case for further proceedings consistent with this opinion.

In particular, the ALJ must make findings regarding the extent, if any, to which Jones's

tracheal tube and oxygen tank limit Jones's functional abilities, including without limitation,

the use of his hands.  Further, such limitation shall be included in a hypothetical question

to a vocational expert.

**IT IS SO ORDERED.**


Date:  August 18, 2011                    s/ *Nancy A. Vecchiarelli*
                                          Nancy A. Vecchiarelli
                                          U.S. Magistrate Judge